JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff-appellant Herman Blankenship (Blankenship; d.o.b. August 24, 1973) appeals from the granting of summary judgment to the following defendants-appellees-movants: (1) Manitex, Inc.[1]; (2) Sun and Seed Landscaping, Gregory Naploszek, and Paula Naploszek[2]; (3) CRT Tree Service, Mr. Simms Goodman, and Mr. Robert Doyle, Jr.[3]; (4) MIRK, Inc.[4]; (5) Progressive Casualty Insurance Company[5]; and, (6) Capitol Indemnity Corporation[6]. For the reasons adduced below, we affirm.
 {¶ 2} A review of the record on appeal indicates that Blankenship was severely injured in an accident while bungee bouncing at approximately 3:10 p.m. on Saturday, May 27, 1995.[7]
 {¶ 3} Blankenship was employed, at times, by both CRT Tree Service and Sun Seed Landscaping, and had just returned to the Sun 
Seed Landscaping premises after having returned a stump grinding machine to a rental company. Goodman testified that the crane, which he had leased approximately two weeks prior to the accident, was being stored on the premises of Sun Seed as a favor from Gregory Naploszek. Goodman deposition at 7-8.
 {¶ 4} According to Blankenship, Doyle, an employee of CRT Tree Service, had already set up the boom crane with the jib extension by the time Blankenship arrived. Blankenship deposition at 40, 63. Doyle testified that no wire rope retaining pins were removed during the set up of the crane, and that he was unaware of the missing pins until after the accident had happened. Doyle deposition at 39-41. Doyle also testified that he was not trained on the operation of the crane, and did not recall if there were operating manuals with the crane or whether there was an aluminum load charter capacity chart warning sign on the crane. Doyle deposition at 53-55. Goodman and Greg Naploszek were on the scene for a period of time with Doyle and Blankenship. Goodman had been summoned there by radio so as to watch Doyle and others engage in bungee bouncing. In fact, while the crane was set up that afternoon, Goodman had hoisted Greg Naploszek and his son up into the air with the crane without bouncing so they could look around from the elevated vantage point. Gregory Naploszek deposition at 9. Following this, Goodman and Naploszek joked with Doyle about Doyle getting up in the air and bungee bouncing from the crane, but the two business owners decided to leave the area. Before Goodman and the Naploszeks left the scene, Goodman and Gregory Naploszek allegedly ordered Doyle and Blankenship to break down the equipment, pack up everything and go home. Goodman deposition at 54-55; Gregory Naploszek deposition at 10, 65-66. Doyle disputed that these instructions were given, testifying that Goodman said don't be all day with this stuff, you know, finish up. That was it., Doyle deposition at 11-12, and Gregory Naploszek told him to don't take all day. Doyle deposition at 29. Doyle specifically stated that he was not told to put this stuff away right now. Doyle deposition at 29. Blankenship testified that, before leaving the scene, Goodman told him to take it easy. Blankenship deposition at 87. Blankenship interpreted this take it easy instruction to mean not so much bouncing . . . Just a little bit of bouncing I guess. He didn't want any bouncing too high. Blankenship deposition at 115.
 {¶ 5} With Doyle at the crane controls, the employers gone from the scene, and the crane still deployed to its maximum length of 108 feet using the optional jib extension, Blankenship climbed into a harness. This harness was attached to a forty foot length of blue and white bungee cord, which in turn was secured to the crane's steel wire rope at the lower load block. The lower load block assembly consists of a steel hook, which is attached to a short length of wire cable, which is attached to a heavy steel ball (a.k.a. the overhaul ball), which is attached to the wire rope used by the crane. According to the May 27, 1995 Brooklyn Police Department supplementary report on the incident, the distance from the tip of the crane to the ground measured 105 feet. Doyle then retracted the wire rope, thereby hoisting Blankenship into the air. While Blankenship was suspended in mid-air, Doyle spasmodically raised and lowered the wire rope so as to cause Blankenship to bounce up and down in the air. According to Blankenship, he bounced above the jib. Blankenship deposition at 83. Blankenship also admitted to one previous episode involving bungee jumping, approximately nine months prior to this accident, when, despite being scared by the idea of dropping off a bridge and being hurt, he was, at his own insistence, dropped by a friend from a bridge at Boston Mills Ski Resort. Id. at 24-25.
 {¶ 6} This bouncing caused the wire rope to derail from the deep groove in the pulley (a.k.a. jib sheave), which was mounted between the two steel side plates of the upper load block assembly at the extension jib point, and slide down to the end of the main boom, a.k.a. the boom point, where it caught hold. According to the police supplementary report, this derailment action caused approximately25 feet of wire rope to now be immediately available to the acrobatic Blankenship. With this extra length of wire rope now in play, Blankenship plummeted to the ground where he struck a pile of logs.
 {¶ 7} Inspection of the crane subsequent to the accident revealed several anomalies in the mechanical operation of the machine that day. First, two steel wire rope retaining pins, which would normally be located running through the two steel side plates of the upper load block at the jib point and whose safety function is to prevent the lower load block from riding up and over the sheave and thereby cause the wire rope to derail, were missing. These retaining pins must be removed in order to place wire rope inside the groove of the sheave. Manitex brief at 6, Fig. 5; accord, the January 12, 1995 engineering report prepared by plaintiff's expert David W. Kassekert, at 2, Description of the Crane. These retaining pins were allegedly given to Goodman by Doyle after the accident: According to Goodman, Doyle had put the pins inside the flatbed truck. Goodman deposition at 29-31; Gregory Naploszek deposition at 53-56. However, Doyle denied ever having these pins. Doyle deposition at 42. Second, the anti-two block safety device on the jib point was not activated by the operator at the time of the accident.[8]
 {¶ 8} Blankenship filed his original action on January 13, 1997 See Cuyahoga County Common Pleas Court, General Division, Case No. 322825. Following four amended complaints and extensive discovery, a number of the defending parties therein filed motions for summary judgment. On June 16, 1998, Blankenship filed a combined brief in opposition to these motions for summary judgment. Also on June 16, 1998, the trial court issued status form half-sheet orders which granted the motions for summary judgment for the following parties: (1) Capitol Indemnity; (2) CRT Tree Service, Goodman, and Doyle; (3) Progressive; (4) Manitowoc Company; (5) Sun Seed Landscaping, Gregory Naploszek, and Paula Naploszek: These summary judgment orders were journalized one day later, sometime on Wednesday, June 17, 1998. See Journal Vol. 2228, page 650. Also on June 17, 1998, at 9:15 a.m., Blankenship filed a notice of voluntary dismissal, without prejudice, of all claims pursuant to Civ.R. 41(A)(1).[9]
 {¶ 9} Blankenship then filed a notice of appeal on Monday, July 20, 1998, from the summary judgment rulings in the first action. This appeal was dismissed sua sponte on September 3, 1998, for failing to file a timely notice of appeal. See Cuyahoga App. No. 74909.[10]
The thirty-day appeal period had expired on Friday, July 17, 1998.
 {¶ 10} On January 7, 1999, Blankenship refiled the first action. See Cuyahoga County Common Pleas Court, General Division, Case No. 373437. On February 2, 1999, the case was reassigned to the docket of the judge who had been originally assigned to the first action. This refiled complaint alleged the following causes of action: (1) count one, negligence by Doyle in the operation of the crane for bungee bouncing; (2) count two, negligence by John Doe defendants 1 through 5 who were believed to be employees of CRT Tree Service and who were thought to be involved in the bungee bouncing activity on the day of the accident; (3) count three, vicarious liability/respondeat superior by the CRT defendants[11] for the negligence of Doyle and John Doe defendants 1 through 5; (4) count four, negligence by the CRT defendants; (5) count five, negligent entrustment by the CRT defendants in entrusting the mobile crane to Doyle and John Doe defendants 1 through 5; (6) count six, piercing the corporate veil of the CRT defendants so as to hold Goodman and the Naploszeks personally liable for the wrongful acts of their respective businesses; (7) count seven, premises liability by the CRT defendants in failing to warn Blankenship of a hazardous condition (the mobile crane) on the premises; (8) count eight, declaratory relief against Progressive Insurance Company on the issue of business insurance coverage for the truck in question; (9) count nine, declaratory relief against Capitol Indemnity Corporation on the issue of general liability and/or business insurance coverage for the accident in question; (10) count ten, negligence by Mirk and Manitex in leasing and/or producing the crane without effective safeguards to prevent derailment of the wire rope; (11) count eleven, strict liability by Mirk and Manitex for leasing/selling a product which was defective due to a lack of safety precautions, inadequate warnings and instructions; (12) count twelve, breach of express and implied warranties of merchantability in connection with the crane; (13) count thirteen, post-manufacture failure to warn by Mirk and Manitex; (14) count fourteen, punitive damages from Mirk and Manitex.
 {¶ 11} On December 9, 1999, the trial court, using half sheet status form entries without elucidation, granted summary judgment motions filed by the following parties: (1) Progressive; (2) Capitol Indemnity; (3) Manitex; (4) CRT Tree Service, Goodman, and Doyle; (5) Sun Seed Landscaping, Gregory Naploszek, and Paula Naploszek. See Journal Vol. 2408, pages 511-512.
 {¶ 12} Blankenship filed his notice of appeal on January 7, 2000, from these December 9, 1999 summary judgment rulings. See Cuyahoga App. No. 77485. On September 6, 2000, this court dismissed appeal 77485 for lack of a final appealable order because the trial court had failed to declare the rights of the parties with regard to count eight of Blankenship's complaint for declaratory relief and Progressive's counterclaim for declaratory relief.
 {¶ 13} On January 23, 2002, the trial court issued the following two orders relating to the remanded declaratory relief issues:
 {¶ 14} Renewed motion for summary judgment of defendant Progressive Insurance Company is granted. The court finds that the insurance policy at issue is a commercial auto policy which provides coverage for claims arising from the operation, maintenance, or use of the vehicle by an insured when the vehicle is used as a motor vehicle. The policy provides coverage for mobile equipment such as a crane but only when it is being carried or towed by the insured auto. Plaintiff's claims arise from the use of the crane as mobile equipment but not during the transportation of the crane. Therefore, the court declares that Progressive Insurance has no duty to indemnify, defend, or provide any benefits under the policy to any party to this action. See Journal Vol. 2693, page 992.
 {¶ 15} Defendant, Capitol Indemnity Corporation's motion for summary judgment is granted. The court finds that plaintiff's claims arise from the use of mobile equipment in a stunting activity which is a specific exclusion under Capitol's policy. Therefore, the court declares that Capitol Indemnity Corporation owes no insurance coverage for (sic) incident in question. See Journal Vol. 2693, page 993.
 {¶ 16} On February 22, 2002, Blankenship filed his notice of appeal sub judice from the summary judgment rulings of December 9, 1999, and the declaratory relief rulings of January 23, 2002.
 {¶ 17} Appellant-Blankenship presents two assignments of error for review.
 {¶ 18} The first assignment of error states: The trial court erred in granting appellees' various motions for summary judgment with no articulation whatsoever of the basis for doing so. Appellant's brief at 18.
 {¶ 19} With regard to this assignment appellant briefly relates his exasperation at being forced to rehash his briefs in opposition to summary judgment in light of the trial court providing little guidance as to which of the movants' arguments the trial court found persuasive and dispositive as to each particular movant. Since the situation complained of similarly complicates the appellate review of the rulings, we can only state that we share in appellant's consternation. However, we know of no authority which mandates the trial court to state with extreme particularity its reasons for ruling on a motion for summary judgment.[12]
All a court must do when ruling on a motion for summary judgment is to issue an entry which contains a clear and concise pronouncement of the Court's judgment and a sufficient pronouncement of its decision upon which to review the issues raised by appellant's appeal. Rogoff v. King
(1993), 91 Ohio App.3d 438, 439. The trial court's entries with regard to summary judgment met this standard.
 {¶ 20} The first assignment of error is overruled.
 {¶ 21} The second assignment of error states: The trial court erred in granting appellees' various motions for summary judgment. Appellant's brief at 18.
 {¶ 22} The standard of appellate review for a summary judgment ruling is the following:
 {¶ 23} This court reviews the lower court's grant of summary judgment de novo. Brown v. Scioto Bd. of Comm'rs. (1993), 87 Ohio App.3d 704, 622 N.E.2d 1153. An appellate court applies the same test as the trial court. Zaslov v. The May Dept. Stores Co. (Oct. 1, 1998), Cuyahoga App. No. 74030, 1998 Ohio App. LEXIS 4654, unreported. Summary judgment is appropriately rendered when no genuine issue as to any material fact remains to be litigated; the moving party is entitled to judgment as a matter of law; it appears from the evidence that reasonable minds can come but to one conclusion; and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. Turner v. Turner (1993), 67 Ohio St.3d 337, 617 N.E.2d 1123, citing to Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 4 Ohio Op.3d 466, 364 N.E.2d 267, and Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 8 Ohio Op.3d 73, 375 N.E.2d 46. A court is permitted to grant a motion for summary judgment where all of the tests provided in Civ.R. 56 are met. See Celotex Corp. v. Catrett
(1986), 477 U.S. 317, 323, 91 L.Ed.2d 265, 106 S.Ct. 2548. Williams v. Permanent General Assurance Corp. of Ohio, Cuyahoga App. No. 80536, 2002-Ohio-4445 at ¶ 16, 2002 Ohio App. LEXIS 4589.
 {¶ 24} Having stated the appropriate standard of review we will now turn our attention to the relevant arguments presented by appellant.
A. Res judicata and primary assumption of the risk.
 {¶ 25} One of the principal arguments presented by appellant is that Blankenship's claims of negligence, contrary to the movants' arguments presented in their respective motions, are not barred by the application of res judicata. These movants argued that the 1998 granting of summary judgment to these parties in the first action, the appeal of which was dismissed based on an untimely notice of appeal, precludes relitigating that summary judgment ruling in favor of these defendants. This argument presumes that the voluntary dismissal by Blankenship in the first action failed to divest the court of jurisdiction to enter the summary judgment orders.
 {¶ 26} It is beyond doubt that the voluntary dismissal was self-executing upon its filing at 9:15 a.m. on June 17, 1998. See Selker Furber v. Brightman (Cuyahoga, 2000), 138 Ohio App.3d 710,742 N.E.2d 203. It is equally beyond doubt that a court speaks through its journal. Thus, the 1998 summary judgment orders would only be effective from the time of their journalization on June 17, 1998. The problem here is that the journalization of the summary judgment entries fails to indicate the time of their journalization. Thus, the question becomes, Was the notice of voluntary dismissal filed before or after the journalization of the summary judgment entries? The clear import of the answer to this query is that these summary judgment rulings in the first action can be given no force or res judicata effect IF the notice of voluntary dismissal was filed prior to the journalization of summary judgment entries.
 {¶ 27} Appellees argue that the record on appeal does not affirmatively demonstrate that the notice of voluntary dismissal was filed with the clerk of court before the journalization of the summary judgment rulings. See Snyder v. Snyder Door Acquisition Co. (May 22, 1996), Hamilton App. No. C-950603, 1996 WL 267508. However, using that same logic, there is nothing in the record on appeal to affirmatively demonstrate that the notice of voluntary dismissal was filed with the clerk of court after the journalization of the summary judgment rulings since the summary judgment entries do not note the precise time of their respective journalizations. In other words, it is at least equally probable, if not more so given the fact that the voluntary dismissal was filed forty-five minutes after the clerk of court's office opened for business that day, that the notice of voluntary dismissal was filed prior to the journalization of the summary judgment rulings in 1998. Considering that the Civil Rules are to be construed and applied to effect just results and eliminate impediments to the expeditious administration of justice, see Civ.R. 1(B), we conclude that in situations such as this, where a notice of voluntary dismissal is filed on the same day as other dispositive motion rulings and that the trial court's journal reflects the time of the filing of the dismissal but not the time of the journalization of the dispositive motions, it is presumed that the time-stamped voluntary dismissal was filed prior to the journalization of the dispositive motion(s).
 {¶ 28} Accordingly, res judicata does not apply in this case with regard to any of the summary judgment rulings in the first action because the trial court was divested of jurisdiction to enter these rulings on the journal. Without effective rulings on these summary judgment motions in the first action, there was no final order upon which to appeal. Lastly, since the voluntary dismissal was made without prejudice, the dismissal was otherwise than on the merits, and Blankenship had the benefit of the one year savings statute upon which to refile his action.
 {¶ 29} The second basis for summary judgment argued by appellant is that, contrary to the movants assertions, Blankenship's claims are not barred by the defense of primary assumption of the risk.
 {¶ 30} This court had cause to visit the defense of primary assumption of the risk in Miljkovic v. Greater Cleveland Regional TransitAuth. (Oct. 12, 2000), Cuyahoga App. No. 77214, 2000 Ohio App. LEXIS 4780 at 11-16, stating:
 {¶ 31} The Supreme Court of Ohio has described the defense of assumption of risk as follows in Anderson v. Ceccardi (1983), 6 Ohio St.3d 110, 112, 451 N.E.2d 780: `* * * (1) consent or acquiescence in (2) an appreciated or known (3) risk * * *. The practicalities of proof require that the defense of assumption of the risk also be applicable where the risk is so obvious that plaintiff must have known and appreciated it.' Id.
 {¶ 32} In Anderson, the Supreme Court announced its merger of implied (or secondary) assumption of risk with contributory negligence in light of the comparative negligence statute. R.C. 2315.19. Id. However, the Court made it clear that it did not intend to merge "express" (or contractual) assumption of risk or "primary" assumption of risk with contributory or comparative negligence. Accordingly, it stated with respect to primary assumption of risk:
 {¶ 33} * * * `Our merger of the two doctrines is not intended to merge that type of assumption of risk defined as' primary assumption of risk, [footnote omitted] which concerns cases where there is a lack of duty owed by the defendant to the plaintiff. This type of assumption of risk is typified by the baseball cases where a plaintiff is injured when a baseball is hit into the stands. Anderson, supra, at 114.
 {¶ 34} The Supreme Court recently observed this distinction and described the results that flow from it in Gallagher v. ClevelandBrowns (1996), 74 Ohio St.3d 427, 431-32, 659 N.E.2d 1232:
 {¶ 35} Although the Anderson court merged implied assumption of risk with contributory negligence, the court found that two other types of assumption of risk did not merge with contributory negligence — express (e.g., contractual) assumption of risk and primary (`no duty') assumption of risk. Anderson's statement that primary assumption of risk does not merge with contributory negligence is of critical importance to our discussion here because when a plaintiff is found to have made a primary assumption of risk in a particular situation, that plaintiff is totally barred from recovery, as a matter of law, just as he or she would have been before Anderson. The net result of Anderson's differentiation between primary and implied assumption of risk is that now it is of utmost importance which type of assumption of risk is put forth as a defense. * * * Id.
 {¶ 36} The Court went on to note that because primary assumption of risk `prevents a plaintiff from establishing the duty element of a negligence case and so entitles a defendant to judgment as a matter of law, it is an issue especially amenable to resolution pursuant to a motion for summary judgment.' Gallagher, supra, at 433.
 {¶ 37} This court most recently applied the primary assumption of risk doctrine in Fulton v. McCarthy Brothers Co., et al., 1996 Ohio App. LEXIS 3185 (July 25, 1996), Cuyahoga App. No. 69900, unreported. There, this court upheld summary judgment for the defendants when plaintiff was injured when he slipped while trying to remove a manhole cover with a pick from an elevated area. In applying Gallagher and Anderson, supra, we stated:
 {¶ 38} When a defendant raises primary assumption of risk, he/she claims to have no duty whatsoever to the plaintiff. Thus primary assumption of risk denies negligence, as a matter of law, because negligence necessarily implies duty. Primary assumption of risk is invoked where the activity undertaken involves such obvious and unavoidable risks that no duty of care is said to attach. Holmes v. Health Tennis Corp. of Am. (1995), 103 Ohio App.3d 364, 659 N.E.2d 812.
 {¶ 39} A plaintiff who reasonably chooses to proceed in the face of a known risk is deemed to have relieved the defendant of any duty to protect him/her. See Siglow v. Smart (1987), 43 Ohio App.3d 55,539 N.E.2d 636. From the above-mentioned facts, we believe Miljkovic, with full knowledge of the potential risks and consequences, voluntarily chose to attempt to cross the railroad tracks. There were overpass bridges within blocks in either direction of this area where the public could cross safely. RTA never authorized, condoned or in any manner permitted the public to cross over its tracks.
 {¶ 40} For these reasons, we find the trial court did not err in granting summary judgment for the defendants-appellees based upon the doctrine of primary assumption of risk.
 {¶ 41} In the instant case, Miljkovic's own testimony established that he considered trains to be dangerous, yet he voluntarily chose to cross the railroad tracks as a matter of convenience. Miljkovic further argues that others routinely crossed the tracks at this location, that other similar accidents had recently occurred near this location and the speed of the trains in this area should impose a duty of care on RTA towards these trespassers. We do not find these arguments to be persuasive. To impose primary assumption of risk, the plaintiff need only consciously expose himself to the known risk, not directly to the exact episode which causes the injury. By analogy to the baseball cases, to which the Supreme Court finds the principle applies, the baseball fan assumes the risk of being hit by a foul ball when he takes his place in the stands, not at the moment the foul ball comes flying his way. In other words, he does not have to envision the exact circumstances under which the injury is incurred. Accordingly, whether the train was speeding or others had been injured near this location is irrelevant under this analysis. That Miljkovic consciously exposed himself to the hazard was illustrated by his own testimony and is undisputed and is completely dispositive of this issue. This concept was well articulated in Fulton:
 {¶ 42} A plaintiff who reasonably chooses to proceed in the face of a known risk is deemed to have relieved the defendant of any duty to protect him/her. See Siglow v. Smart (1987), 43 Ohio App.3d 55, 539 N.E.2d 636. From the above-mentioned facts, we believe plaintiff-appellant, with full knowledge of the potential risks and consequences, voluntarily chose to attempt to remove the manhole cover. Fulton, 1996 Ohio App. LEXIS 3185 at *10.
 {¶ 43} Because the applicability of the defense presents a question of law to be decided by the trial court it is an issue especially amenable to resolution pursuant to a motion for summary judgment. Gallagher, 74 Ohio St.3d at 434.
 {¶ 44} In the present case, it is beyond dispute that Blankenship knew of the general conditions under which the bungee bouncing took place. He knew that Doyle was not a professional bungee bouncer and had concerns as to whether Doyle knew what he was doing. Blankenship knew from personal experience that bungee jumping, an experience very similar to bungee bouncing, caused him to be scared because he feared personal injury which could occur with the activity. He knew that Doyle had set the crane up in proximity to piles of felled timber. He knew that the crane had been rented to assist in trimming trees and was certain that the crane was not designed for, or had previously been used for, bungee bouncing. He allowed Doyle to put the harness onto him. He did not remember if Goodman gave any approval for Doyle or himself to use the crane for bungee bouncing, but he testified that neither employer instructed him to bungee bounce that day. His job at CRT did not involve bungee bouncing. See Blankenship deposition at 21-24, 34-37, 45-47, 52-53, 60, 63-65, 67, 85-86, 127, 163, 173. Although Blankenship had trepidations over the prospect of physical injury and admitted to peer pressure by Doyle to participate and avoid being thought of as a coward, it is evident that Blankenship voluntarily exposed himself to the bungee bouncing activity and its known potential for injury should something go wrong.
 {¶ 45} In addition to these considerations it is also patently obvious that bungee jumping, a close cousin to bungee bouncing, is recognized as an inherently dangerous and ultra hazardous activity due to the risk of falling and the likelihood of severe injury that may result should a fall occur. See Callaway v. Mamsi Life Health Ins. Co.
(2002), ___ Md. App. ___, 2002 Md. App. LEXIS 124 at 59 (There are, to be sure, countless activities that are inherently dangerous, * * * bungee jumping * * * among the activities that come to mind.); Hatch v. V.P.Fair Foundation, Inc. (1999), 990 S.W.2d 126, 136, 1999 Mo. App. LEXIS 315 (Thus, the trial court erred in determining as a matter of law that bungee jumping is not inherently dangerous.); Zivich v. Mentor SoccerClub, Inc. (Apr. 17, 1997), Lake App. No. 95-L-184, 1997 Ohio App. LEXIS at 54, affirmed on other grounds in 82 Ohio St.3d 367, 1998-Ohio-389,696 N.E.2d 201 (bungee jumping considered an inordinately hazardous activity); Spencer v. Killington, Ltd. (1997), 167 Vt. 137, 145,702 A.2d 35, 39, 1997 Vt. LEXIS 23 at 15 (There is a segment of the population that engages in activities which by nature are hazardous or ultra-hazardous. The danger produces the thrill and is the motivation for the undertaking. Bungee jumping, * * * are all activities involving varying degrees of risk.); Perez v. City of Los Angeles (1994),27 Cal.App.4th 1380, 1388, 33 Cal.Rptr.2d 55, 59, 1994 Cal.App. LEXIS 878 at 15 (bungee jumping considered a hazardous recreational activity whose thrill is enhanced by height and potential danger). Since the dangers and thrills associated with bungee jumping and bungee bouncing are substantially similar, and the attendant inherent risks of falling to the ground are identical as between the two activities, we see no reason not to consider bungee bouncing an inherently dangerous and ultra-hazardous activity.
 {¶ 46} In many ways, this activity is similar to the rope swinging activity which occurred in Vorum v. Joy Outdoor Education Ctr. (Dec. 21, 1998), Warren App. No. CA98-06-072, 1998 Ohio App. LEXIS 6139. In Vorumthe plaintiff was injured at a motivational seminar conducted by his employer when, while attempting to traverse an elevated obstacle erected between two trees using a swinging rope, his foot hit the ground prematurely causing an injury to his knee. Plaintiff's mechanical engineer expert opined that the swing apparatus did not contain appropriate safety devices which would have prevented the accident and injuries. The appellate court affirmed the granting of summary judgment to the defendant on the basis that plaintiff's claim was barred by the application of primary assumption of the risk, stating in part:
 {¶ 47} Similarly, the risk of falling from a rope, or having one's feet make premature contact with the ground without actually falling, are risks which are inherent in the activity of rope swinging. Although the risks can be reduced by warnings or, presumably, other safety precautions, the risks cannot be eliminated. Therefore, primary assumption of the risk was a complete bar to appellant's claim and summary judgment was appropriately granted. Vorum, 1998 Ohio App. LEXIS 6139 at 7-8.
 {¶ 48} As in Vorum, the risks herein may have been reduced by appropriate warnings or safety precautions, but the risks could not be entirely eliminated.
 {¶ 49} Thus, the defense of primary assumption of the risk bars Blankenship's claims and summary judgment was proper on this basis.
B. Invitee status.
 {¶ 50} CRT defendants raised this invitee argument in its motion for summary judgment relative to the premises liability claim asserted by Blankenship against the CRT defendants. See complaint at count seven which alleged that the CRT defendants maintained a dangerous condition on the premises in the form of the crane and did not warn Blankenship of that hazard. There is a significant problem with this claim.
 {¶ 51} The premises on which the crane was parked was owned by Sun Seed Landscaping, not CRT Tree, Goodman and Doyle. As recognized by appellant, a landowner has a duty to warn the invitee of latent or concealed defects of which the landowner should have known. Appellant's brief at 27, citing Patete v. Benko (Cuyahoga, 1986), 29 Ohio App.3d 325. Since CRT, Goodman and Doyle were not the landowners, this premises liability claim against them must fail.
 {¶ 52} With regard to the premises liability claim asserted against the landowners of the premises under count seven of the complaint, to-wit, Sun Seed and the Naploszeks, Blankenship was not an invitee at the time of the accident. Instead, Blankenship, was on the premises for his own benefit as an employee of CRT Tree, thereby making him a licensee vis-a-vis Sun Seed and the Naploszeks, who received no benefit from permitting CRT Tree to park the crane on Sun Seed property. See Doe v. First Presbyterian Church (1998), 126 Ohio App.3d 358,365.
 {¶ 53} As a licensee, Blankenship took his license to enter the premises subject to its attendant perils and risks and Sun Seed owed Blankenship no duty of care except to refrain from willful, wanton or reckless conduct which was likely to injure him. Gladon v. GreaterCleveland Regional Transit Auth., 75 Ohio St.3d 312, 317, 1996-Ohio-137,662 N.E.2d 287; Light v. Ohio Univ. (1986), 28 Ohio St.3d 86,502 N.E.2d 611. The record fails to demonstrate that Sun Seed Landscaping and/or the Naploszeks engaged in wanton, willful or reckless conduct which was likely to injure Blankenship. The apparent danger posed by the bungee bouncing was open and obvious thereby obviating any duty on the part of the landowner from protecting Blankenship, see Dulik v.K-Mart Discount Stores, Inc. (1989), 57 Ohio App.3d 61, and there is no evidence showing that these defendants had knowledge of any latent hazards associated with Doyle's set-up or operation of the crane. Accordingly, summary judgment was properly granted on the premises liability claim to all parties.
C. Product liability.
 {¶ 54} Appellant's product liability claims are premised on the argument that the crane manufacturer, Manitex, Inc., committed a design defect in not providing adequate instructions and warnings on the crane, and not providing a mechanical device of some sort which would prevent the retaining pins from being removed permanently from their location on the crane. The claim of products liability against MIRK is premised on it being a supplier who marketed the crane and thereby helped place the allegedly defective crane, in a form substantially unchanged from that received from the seller, into the stream of commerce. See Temple v. WeanUnited, Inc. (1977), 52 Ohio St.2d 317, syllabus.
 {¶ 55} The evidence indicates that Manitex in April of 1992, out of concern over the danger posed by persons using cranes for bungee activities, issued a bulletin to its distributors advising them that Manitex is opposed to and does not condone the use of its product (or any other manufacturer) for this application. The potential for serious injury or death resulting from negligent operations in this application is great and therefore must be avoided. Please consider this bulletin as our formal instruction to you that Manitex products are not to be used for bungee jumping.[13] There is no debate as to whether Toombs, a Manitex distributor, received this bulletin.
 {¶ 56} In late 1992 Manitex shipped the completed and inspected crane to Toombs accompanied by (1) a large, detailed owner's manual which was contained in a three-ring binder, (2) a condensed, forty-page owner's manual which was intended to stay with the crane at all times to aid the operator, and (3) a series of warning labels which were permanently affixed to the crane. See affidavit of Joe Conway, executive vice-president and general manager of Manitex, Inc. Significantly, one of the warning plates, termed a capacity chart and attached at the operator's console of the crane states, in part: Warning 1. The operator must read and understand the owner's manual before operating this crane. This capacity chart also contains a separate warning concerning the anti-two block safety device: Warning Anti-two block system must be in good condition before operating crane. Refer to owner's manual.
 {¶ 57} The owner's manuals include detailed instructions on setting up the crane, using the jib extension, and using the crane's safety devices. These instructions, in part, expressly instruct the operator to perform the following: (1) to not use the jib without the jib limit switch and not handle any load until the anti-two block warning horn and shutdown are operational; (2) to accelerate and decelerate the load smoothly so as to avoid stress on the crane machinery; (3) to avoid sudden starts and stops when swinging the load; (4) to not hoist, lower, or swing the load while personnel are on the load or hook and to only carry personnel in an approved personnel carrier; (5) to only permit the crane to be operated by qualified operators who are thoroughly familiar with crane operations, the owner's manual, and the safety hazards involved; (6) to reinstall the wire rope retaining pins when erecting the jib extension; (7) to daily check and confirm the proper rigging of the wire rope through the sheaves and the load blocks and check for missing nuts, screws, and pins. Goodman testified that he received these owner's manuals from MIRK and kept the smaller manual with the crane. Goodman deposition at 116-117. Doyle testified that he never looked for these manuals on the date of the accident, and had no idea if they were present or not. Doyle deposition at 54.
 {¶ 58} Appellant argues that the failure of the crane operator to properly install the wire rope retaining pins in the upper load block of the jib extension was reasonably foreseeable, and that inadequate warnings concerning this forseeability created a defective design of the crane which proximately caused the injury to Blankenship.
 {¶ 59} R.C. 2307.76 provides:
 {¶ 60} § 2307.76 When product is defective due to inadequate warning or instruction.
 {¶ 61} (A) Subject to divisions (B) and c) of this section, a product is defective due to inadequate warning or instruction if either of the following applies:
 {¶ 62} (1) It is defective due to inadequate warning or instruction at the time of marketing if, when it left the control of its manufacturer, both of the following applied:
 {¶ 63} (a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;
 {¶ 64} (b) The manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.
 {¶ 65} (2) It is defective due to inadequate post-marketing warning or instruction if, at a relevant time after it left the control of its manufacturer, both of the following applied:
 {¶ 66} (a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;
 {¶ 67} (b) The manufacturer failed to provide the post-marketing warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.
 {¶ 68} (B) A product is not defective due to lack of warning or instruction or inadequate warning or instruction as a result of the failure of its manufacturer to warn or instruct about an open and obvious risk or a risk that is a matter of common knowledge.
 {¶ 69} (C) An ethical drug is not defective due to inadequate warning or instruction if its manufacturer provides otherwise adequate warning and instruction to the physician or other legally authorized person who prescribes or dispenses that ethical drug for a claimant in question and if the federal food and drug administration has not provided that warning or instruction relative to that ethical drug is to be given directly to the ultimate user of it.
 {¶ 70} In the present case, it cannot be said that the crane was defective due to inadequate warning or instructions relating to the need for wire rope retaining pins. While Manitex knew about the potential that cranes were being used in bungee activities, or had reasonable cause to believe that its cranes may be used in those activities, see R.C. 2907.76(A)(1)(a), Manitex issued a special bulletin in 1992 discouraging bungee activities and provided express warnings which, if followed, would have prevented the crane from being used in bungee activities and injuries flowing from that activity. Specifically, the owner's manual precluded the hoisting, lowering, or swinging of the crane while personnel were on the load or hook. The capacity chart, affixed conspicuously to the operator's console, mandated that the operator read and comply with the operator's manual prior to operating the crane. These warnings having been given, the manufacturer could reasonably assume that they would be read and heeded. Freas v. Prater Constr. Corp., Inc. (1991),60 Ohio St.3d 6, 573 N.E.2d 27. There is no doubt that the crane was safe had the safety warnings been followed. Therefore, the instructions were not defective and the crane was not unreasonably dangerous for its normal use. Id.
 {¶ 71} Since it is determined that the manufacturer was not negligent, it follows that MIRK, the after-market supplier, was also not negligent. See R.C. 2307.78(A)(1).
 {¶ 72} Accordingly, the trial court properly granted summary judgment to Manitex and MIRK on this basis as well.
D. Insurance issues.
 {¶ 73} These issues involve the construction of a written contract. Recently, this court stated the following with respect to the standard of review of construing the terms of a contract:
 {¶ 74} `In the construction of a written contract, it will, be read as a whole, and the intent of each part will be gathered from a consideration of the whole. The language and terms of the contract are to be given their plain, common, and ordinary meanings. But if the language is ambiguous, then a court must construe the language against the party who prepared the contract. Language is ambiguous if it is reasonably susceptible to two or more constructions. (Footnotes omitted.)' McClorey v. Hamilton Cty. Bd. of Elections (1998), 130 Ohio App.3d 621, 624-624, 720 N.E.2d 954, citing Worth v. Aetna Casualty Surety Co. (1987), 32 Ohio St.3d 238, 240, 513 N.E.2d 253, 256; Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth. 78 Ohio St.3d 353, 361, 1997-Ohio-202, 678 N.E.2d 519, 526; Central Realty Co. v. Clutter (1980), 62 Ohio St.2d 411, 413, 16 Ohio Op.3d 441, 406 N.E.2d 515, 517; and, George H. Olmsted Co. v. Metropolitan Life Ins. Co.
(1928), 118 Ohio St. 421, 426, 6 Ohio Law Abs. 269, 161 N.E. 276, 277. Weiner v. American Cancer Society, Cuyahoga App. No. 80308, 2002-Ohio-2718 at ¶ 18, 2002 Ohio App. LEXIS 2950 at 7-8.
 {¶ 75} The Capitol policy in issue provides, in relevant part, that [t]his insurance does not apply to . . . bodily injury . . . arising out of . . . [t]he use of `mobile equipment' in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity. (Italicization added.) Capitol policy form CG 00 01 10 93, Section I, paragraph 2, Exclusion h. It is not contested that the truck-mounted crane in this action qualifies as mobile equipment under the policy. The policy further insures employees of the insured, but only for acts within the scope of their employment by you or while performing duties related to the conduct of the insured's business. Capitol policy form CG 00 01 10 93, Section II, paragraph 2(a).
 {¶ 76} The term stunt has been defined as something done for a thrill, to attract attention, * * *. Webster's New Twentieth Century Dictionary (2d Ed. 1966) 1809.
 {¶ 77} As previously determined by this court with respect to Blankenship's claim for workers' compensation benefits, Blankenship was not in the course and scope of his employment while bungee bouncing. SeeBlankenship v. Goodman (Dec. 16, 1999), Cuyahoga App. No. 75463. Furthermore, after reviewing the record herein, it cannot be seriously questioned that the bungee activity was not prearranged that day since the crane had to be set up for that purpose some time prior to Blankenship actually being hoisted up, the bouncing was done for a thrill, and the activity was not related to the tree trimming enterprise of CRT Tree Service. Also, Blankenship and Doyle were engaged in a personal frolic unrelated to their employment. Thus, Capitol was not required to provide coverage for Blankenship's injuries caused by the bungee bouncing.
 {¶ 78} The Progressive policy in issue, which covered the insured's business autos, provided coverage to mobile equipment as an insured auto only when being carried or towed by your insured auto. Progressive policy form 1050 (5-91), Part I, Additional Definitions for autos, at 2. The policy defined mobile equipment as any of the following types of land vehicles, including any attached machinery or equipment: a. Equipment such as: * * * cranes, * * *. (Italicization added.) Progressive policy form 1050 (5-91), Definitions Section, at 7(a).
 {¶ 79} At the time of the bungee bouncing the flatbed truck with its attached crane equipment, was a piece of mobile equipment under the definition terms of the policy, was stationary and incapable of being moved, and was not being carried or towed by any other covered auto. Thus, as a matter of law, the flatbed crane truck was not an insured vehicle under the policy at the time of the bungee bouncing.
 {¶ 80} Accordingly, the trial court did not err in granting summary judgment to Capitol or Progressive.
 {¶ 81} In summary the trial court properly granted summary judgment to all parties.
Judgment affirmed.
It is ordered that appellee recover of appellant their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
MICHAEL J. CORRIGAN, J., and JAMES J. SWEENEY, J., CONCUR.
N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc.App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also, S.Ct.Prac.R. II, Section 2(A)(1).
[1] Manitex, Inc. is the manufacturer of the Model 1568 telescopic hydraulic boom crane which was involved in the accident herein. The main boom on the crane has three telescoping sections. When fully deployed, the three sections on the main boom measure 68 feet long. The main boom may be extended up to forty additional feet using an optional jib extension. According to the manufacturer, the jib extension is mounted to the side of the main boom on a hinge.
[2] Sun and Seed Landscaping, a sole proprietorship involved in the business of landscaping, tree-cutting and stump removal, is owned by Gregory Naploszek (d.o.b. May 12, 1967) and located in Brooklyn, Ohio. Paula Naploszek is the spouse of Gregory Naploszek.
[3] CRT Tree Service, a tree-cutting and trimming business in Brooklyn, Ohio, is owned by Mr. Simms Goodman (Goodman; d.o.b. February 16, 1968). CRT Tree Service rented the crane from MIRK, Inc. Mr. Robert Doyle, Jr. (Doyle; d.o.b. December 8, 1968), an employee of CRT Tree Service, was a co-employee of Blankenship at the time of the accident.
[4] MIRK, Inc., which is in the business of leasing equipment, is an Ohio corporation located in Orrville, Ohio.
[5] At the time of the accident to Blankenship herein, Progressive Casualty Insurance Company maintained a commercial vehicle policy of automobile insurance for its insured, Mr. Simms Goodman d.b.a. CRT Tree Service, on the commercial vehicle (a Ford F700 flatbed truck) which the boom crane was mounted on.
[6] At the time of the accident to Blankenship herein, Capitol Indemnity Corporation maintained a commercial general liability policy in favor of its insured, Mr. Simms Goodman d.b.a. CRT Tree Service.
[7] According to plaintiff's engineering expert, David W. Kasserkert:
 Bungee bouncing is a variation of the activity of bungee jumping. Rather than jumping off of a high structure, the `bouncer' wears a harness that is attached with a bungee cord to the wire cable of a crane and is hoisted off the ground. An operator then takes up and lets out the cable to create a bouncing motion for the participant. January 12, 1998, report of David W. Kasserkert, at 2, Analysis.
[8] Two-blocking, according to the crane manufacturer, occurs when the crane operator raises the lower load block so far that it crashes into the upper load block. Appellee Manitex brief at 6. The crane manufacturer further describes the use of this anti-two block safety device in its appellate brief at 7-8:
 Manitex equips all of its cranes with an `anti-two block' safety to halt the upward travel of the lower load block in order to prevent two-blocking. A weighted chain holds a limit switch mounted on the upper load block in the ON position. The wire rope travels freely inside a hole in the weight. If the operator raises the lower load block too high, the overhaul ball will lift the weight, taking the tension off the chain, and causing the limit switch to spring into the OFF position. This actuates an interlock system to sound a loud warning horn and to prevent the winch from raising the lower load block any higher. * * *
 The jib and main boom have their own limit switches for the anti-two block device. Thus, when switching between the jib and the main boom, the operator must move the weighted chain to the applicable limit switch. * * * (Citations omitted.)
[9] Despite the presence of a counterclaim by Capitol Indemnity Corporation seeking declaratory judgment on whether insurance coverage was available under its policy, the use of a notice of voluntary dismissal pursuant to Civ.R. 41(A)(1)(a) was proper because this counterclaim could remain pending for independent adjudication by the trial court.
[10] Blankenship had also filed for workmens' compensation benefits for his bungee bouncing injuries. Ultimately, his ineligibility to participate in the fund was affirmed because the bungee bouncing activity of May 27, 1995, did not arise out of the course and scope of his employment. See Blankenship v. Goodman (Dec. 16, 1999), Cuyahoga App. No. 75463.
[11] The CRT defendants were identified in the complaint, at paragraph 6, as the following: (1) CRT Tree Service, Sun Seed Landscaping, Goodman, and the Naploszeks.
[12] Furthermore, Civ.R. 52 expressly provides that findings of fact and conclusions of law are not required of a trial court in ruling on a motion made pursuant to Civ.R. 56.
[13] One year later, in July of 1993, a crane manufacturer trade group, the Power Crane and Shovel Association, endorsed the belief that cranes should not be used for amusement equipment or devices in furtherance of activities such as bungee jumping.